IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MICHAEL CAMACHO,<br><br>Plaintiff,<br><br>vs.<br><br>ASSOCIATION OF APARTMENT OWNERS OF KE NANI KAI, *et al.*,<br><br>Defendants. | Civil No. 24-00372 MWJS-RT<br><br>ORDER GRANTING DEFENDANTS ASSOCIATION OF APARTMENT OWNERS OF KE NANI KAI AND CERTIFIED MANAGEMENT INC.'S MOTION TO DISMISS [DKT. 126] |

**INTRODUCTION**

In an earlier phase of this case, Plaintiff Michael Camacho filed a Second Amended Complaint (SAC) in which he alleged that Defendants Association of Apartment Owners of Ke Nani Kai (the AOAO) and Certified Management, Inc., d/b/a Associa Hawaii (Associa) violated state and federal antidiscrimination laws and Hawaiʻi criminal law as part of a long-running campaign of harassment, retaliation, and denial of reasonable accommodations directed at Camacho and his wife. After Defendants moved for judgment on the pleadings, the court granted the motion and dismissed the SAC. The dismissal was with prejudice as to the criminal counts in the complaint, as those claims could not be asserted by Camacho as a matter of law. But because it appeared that Camacho could possibly cure the deficiencies in the SAC's civil claims—which appeared to be untimely on the face of the complaint—the court granted

him leave to amend. Camacho then filed a Third Amended Complaint (TAC), which provides additional details and new factual allegations in an attempt to demonstrate that his claims are timely.

Defendants have now moved to dismiss the TAC. They argue that Camacho's claims remain untimely, and that the new complaint still fails to include factual allegations which might support tolling the statute of limitations and thereby render the claims in the TAC timely. The court agrees. And whereas the initial complaint suggested a possible basis for amendment, the TAC does not: its additional details demonstrate that further leave to amend would be futile. The court therefore GRANTS Defendants' motion to dismiss and dismisses the TAC with prejudice and without further leave to amend.

## BACKGROUND

A detailed overview of the facts giving rise to this suit is provided in the court's order granting Defendants' motion for judgment on the pleadings. *See Camacho v. Ass'n of Apt. Owners of Ke Nani Kai*, Civ. No. 24-cv-00372, 2026 WL 1196577 (D. Haw. May 1, 2026). Accordingly, the court provides the following background only as necessary to give context to its ruling and to reflect the new and relevant factual allegations in the TAC. And at the motion to dismiss stage, the courts assumes that the factual allegations in the TAC are true. *See, e.g.*, *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1136 (9th Cir. 2022).

In 2018, Camacho moved into Ke Nani Kai, a condominium on the island of Moloka‘i, in part to accommodate his medical conditions. His wife, "a person of Austronesian descent," lived off-island but would visit Camacho "for a few days at a time." Dkt. No. 125, at PageID.1479. Shortly after moving to Ke Nani Kai, Camacho became involved in a dispute with the AOAO over his wife's requested use of a service dog on the property. When representatives of the AOAO made requests for documentation supporting the request for the use of a service dog, Camacho responded by submitting an inquiry to the United States Department of Housing and Urban Development (HUD) on October 20, 2019, regarding the legality of the AOAO's requests.

On October 28, 2019, eight days after Camacho submitted his inquiry to HUD, he received a response. HUD informed Camacho that his "housing discrimination inquiry" had been "received by HUD pursuant to federal fair housing laws" but had nonetheless been "closed for lack of jurisdiction because of [his] previous complaint, and therefore these issues could not be raised again in a subsequent complaint." *Id.* at PageID.1481. Additionally, "HUD claimed that [Camacho's] housing discrimination complaint was currently under investigation by the Hawai‘i Civil Rights Commission (HCRC)." *Id.* This came as a surprise to Camacho, who had never filed any prior complaint, and so he responded to HUD that same day to inform them that this was "the first time [he had] ever made a complaint or inquiry against his condo association"

and the state could not be "investigating [his] condo association on [his] behalf" because he had "never notified [the state] of anything about [the AOAO]." *Id.* But later that day, HUD replied to Camacho and confirmed that "the record allegedly showed different . . . , so [Camacho] had to contact HCRC if [he] wanted to raise issues about the investigation of [his] case." *Id.* The TAC does not allege that Camacho ever followed up further with HUD or reached out HCRC as HUD had suggested.

Over the course of the next several months, the dispute over the service dog continued to escalate. Camacho and his wife faced harassment and intimidation from individuals associated with the AOAO, including from a property manager who physically menaced Camacho's wife. During this time period, Camacho also requested disability accommodations from the AOAO on at least two occasions, but these requests went unacknowledged.

In the spring of 2020, a new front in the battle between Camacho and the AOAO developed. During an AOAO Board meeting on March 21, a new House Rule was adopted to prevent "[p]ersons who rent a unit for less than five consecutive days" from having "any additional guests using the recreation areas except with the express permission of the Property Manager." *Id.* at PageID.1483. This rule—styled by Camacho as the "anti-islander rule" in the TAC—was ostensibly promulgated "to stop the so-called largest complaint in the summer of local renters renting a unit for the weekend and bringing their friends to use the pool," but Camacho and his neighbors

believed that the true purpose of the rule was to "keep out locals of Austronesian descent," like Camacho's wife, "from the recreation area." *Id.* at PageID.1483-84. So in April 2020, Camacho contacted HCRC about filing a complaint and submitted a "Pre-Complaint Questionnaire" (PCQ) to the agency. *Id.* at PageID.1484. Although it is not clear what allegations were included in the April 2020 PCQ, Camacho submitted a second PCQ to HCRC in June 2020, in which he alleged that the AOAO had discriminated against him based on his disability and race, color, and/or national origin, and had retaliated against him. *Id.* at PageID.1487. He also included allegations about the anti-islander rule. He "re-sent the same PCQ to HCRC" on August 27, 2020. *Id.* at PageID.1488. After several follow-ups from Camacho, HCRC eventually responded and requested additional information on September 11, 2020. *Id.* An extended back-and-forth occurred between Camacho and HCRC over the course of the next several months, with Camacho making extensive additional allegations to HCRC. *Id.* at PageID.1488-91.

While awaiting responses from HCRC, Camacho again contacted HUD on November 30, 2020, and made various allegations about Defendants' unlawful conduct. *Id.* at PageID.1492. HUD informed him that "in order to evaluate [his] claim," the agency "needed to discuss it with [him]" and requested "additional information by email." *Id.* Camacho provided that information on December 10, but it does not appear

from the TAC that HUD ever took any action or otherwise responded to his submission. *Id.* at PageID.1492-97.

Camacho then turned his attention back to HCRC, submitting new allegations of retaliation on December 21, 2020, which HCRC declined to investigate. *Id.* at PageID.1497-98. Separately, Camacho contacted HCRC on January 22, 2021, to inform HCRC that he "needed to get correspondence by email," but that "if necessary" HCRC could "mail things" to his Maunaloa residence, and that if the agency "only had to send one thing to [him] at that time, like the Charge, then they could send it to [his] friend's house" in Oxnard, California. *Id.* at PageID.1498. HCRC informed Camacho that his proposal of sending his friend in Oxnard "only one document" at a time was "not a viable solution," so he and the agency instead agreed to have mail sent to a General Delivery address in Oxnard provided by the United States Postal Service. *Id.*

Camacho again contacted HCRC in February 2021 in an effort to add the individual AOAO Board members as defendants in his complaint, but HCRC denied his request. Instead, HCRC "completed the Charge only against [the AOAO], Associa," and one individual defendant. *Id.* Camacho attempted twice more to amend the charge to include the additional defendants and to add a further retaliation incident on April 6, 2021, and on May 10, 2021, but HCRC again refused. Due to his inability to amend the complaint through HCRC, Camacho then attempted to file a complaint through HUD, but the federal agency notified him that "it was not possible to file a complaint with

them because [he] [could] only have a complaint open with one" agency, and when he "filed with HCRC it was dual filed with HUD." *Id.* at PageID.1499.

In the meantime, a mediation proceeding between Camacho and Defendants took place via HCRC in October 2021. The mediation did not yield a solution, and Camacho continued attempting to add new allegations to his complaint. On April 7, 2022, he submitted further allegations to HCRC regarding recent retaliation and discrimination, but "HCRC never reviewed [that] amendment." *Id.* In August of the same year, Camacho contacted HCRC to inquire about the status of his complaint and was put in touch with a HCRC investigator. *Id.* at PageID.1500. Although Camacho worked closely with the investigator for the next several weeks, he did not hear from the investigator after September 2022 despite making repeated efforts to contact him, including in a message dated March 29, 2023, seeking to discuss further harassment by the AOAO Board. *Id.* at PageID.1500-02.

On May 12, 2023, HCRC closed Camacho's complaint and "sent a closure letter to an Oxnard, California address that they knew [he] would not receive mail at, instead of my email address or the Moloka'i address that [he] gave them." *Id.* at PageID.1503. That letter explained that Camacho had "90 days to file a private lawsuit against defendants from the date of receipt of [the] closure letter," and specified which of Camacho's complaints had been included in the charge: HCRC had "closed [the] complaints that arose from the allegations in Counts II, III, and IV, but not Counts I or

V; and not the retaliation/ harassment/ racism/ accommodation complaints on October 20, 2019 or April 7, 2022, which they claimed were too old or just ignored them; and not the retaliation/harassment complaints [he] alleged on April 6, 2021, May 10, 2021 and [April] 7, 2022, which were never added to the Charge; and not the harassment complaints [he] alleged on March 29, 2023, and later on January 17, 2024, which were ignored and never reviewed." *Id.* Camacho, unaware of this development, contacted the Hawaiʻi State Ombudsman on August 15, 2023, and again in December 2023, about "HCRC ignoring [his] complaint." *Id.*

Camacho sold his property at Ke Nani Kai on August 31, 2023, and subsequently moved outside of the United States. He continued communicating with HCRC, however, and contacted them again on January 17, 2024, in an effort to add new allegations to his case. He also sought information regarding "how long [he] had to file a lawsuit . . . or if the HCRC complaint tolled the statute of limitations." *Id.* On January 22, HCRC responded to Camacho's query by sending a "blank message with no content." *Id.* In "the Spring of 2024," however, HCRC informed Camacho that his "case was closed but the Closure Letter was sent to Oxnard, California by certified mail and was returned as undeliverable." *Id.* at PageID.1504. On May 6, 2024, Camacho contacted HUD in the hopes of "appeal[ing] this HCRC decision to close [the] retaliation complaint." *Id.* The following day, HUD denied that request and "administratively closed [his] complaint" since it had been initially filed with HCRC.

*Id.* That same day, Camacho sought to appeal HUD's closure, but never received a response. Nearly four months later, on August 29, 2024, he filed the instant lawsuit. Dkt. No. 1.

On May 1, 2026, this court granted Defendants' motion for judgment on the pleading but granted Camacho leave to amend his complaint. Dkt. No. 124. He timely filed the TAC on June 5, 2026. Dkt. No. 125. Defendants then moved to dismiss the TAC. Dkt. No. 126. Camacho opposed the motion, Dkt. No. 128, and Defendants replied, Dkt. No. 129. The court finds the matter suitable for resolution without a hearing, as authorized by Local Rule 7.1(c), and now turns to the merits of Defendants' motion to dismiss.

## DISCUSSION

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations of material fact in the pleadings are taken as true and construed in the light most favorable to the plaintiff. The court's task is to determine whether the complaint contains "sufficient factual matter, accepted as true, to state claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). Allegations that "are no more than conclusions," however, are "not entitled to the assumption of truth," and must be independently supported by factual allegations. *Velasco v. Sec. Nat'l Mortg. Co.*, 823 F. Supp. 2d 1061, 1066 (D. Haw. 2011) (quoting *Iqbal*, 556 U.S. at 679). In other words, a complaint must include sufficient "factual enhancement" to cross over

"the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

### A. The Third Amended Complaint Still Does Not Adequately Allege that Camacho's Claims Are Timely

The Third Amended Complaint raises claims against Defendants in five counts. Count I alleges "Failure to Provide Disability Accommodations" in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3604(f)(3)(B), and its Hawai‘i state law counterpart, Haw. Rev. Stat. § 515-3(a)(9), as well as the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. Count II alleges "Hostile Housing Environment" in violation of the FHA, 42 U.S.C. § 3617, and its state law counterpart, Haw. Rev. Stat. § 515-16.[1] Count III alleges "Retaliation Because of Opposition to and Complaints about Disability and Race/National Origin Discrimination," also in violation of the FHA, 42 U.S.C. § 3617, and its state law counterpart, Haw. Rev. Stat. § 515-16. Count IV alleges "House Rule Discrimination Because of Race, Color and National Origin," in violation of the FHA, 42 U.S.C. § 3604, and its state law counterpart, Haw. Rev. Stat. § 515-3. Finally, Count V alleges "Illegal Assistance Animal House Rules and Enforcement," again in

---

[1] The TAC again attempts to assert claims against Defendants under the Hawai‘i Penal Code. *See* Dkt. No. 125, at PageID.1509, 1527 (citing Haw. Rev. Stat. § 711-1106 (misdemeanor harassment)). The court dismissed these claims with prejudice in its prior order, *see Camacho*, 2026 WL 1196577, at *7-8, and Camacho cannot attempt to relitigate that decision here. These criminal claims are therefore again DISMISSED WITH PREJUDICE.

violation of the FHA, 42 U.S.C. § 3604, and its state law counterpart, Haw. Rev. Stat. § 515-3. *See* Dkt. No. 125, at PageID.1505-48.

In its previous order, the court concluded that each of these counts was "time-barred . . . on the face of the Second Amended Complaint" and granted Defendants' motion for judgment on the pleadings accordingly. *Camacho*, 2026 WL 1196577, at *5. But the court also granted Camacho leave to amend his complaint. And in so doing, the court instructed him to address the apparent statute-of-limitations issues and to "include enough detail about the various charges he filed with HUD and HCRC for the court and Defendants to fairly evaluate which claims in the complaint, if any, were statutorily tolled during the pendency of any investigation into those charges," including by "describ[ing] the factual allegations that formed the basis of each charge, whether each charge was submitted to HUD, HCRC, or both, and whether each charge was resolved by the relevant administrative body (and if so, how it was resolved)." *Id.* at *7.

Camacho has duly included at least some of this information in his TAC. The TAC explains, in relevant part, that on March 18, 2021, after a great deal of back-and-forth between Camacho and the agencies, "HCRC . . . completed the Charge" against Defendants. Dkt. No. 125, at PageID.1498. The complaint was dual-filed with HUD. *See id.* at PageID.1499, 1504. It ultimately included only those "complaints that arose from the allegations in Counts II, III, and IV, but not Counts I or V," despite Camacho's

repeated attempts to add new or additional allegations to the Charge. *Id.* at PageID.1503. And it remained pending until May 12, 2023, when HCRC "closed [Camacho's] complaint" and "sent a closure letter" to a California address associated with Camacho. *Id.* at PageID.1502-03.

In their motion to dismiss, Defendants argue that notwithstanding the additional factual detail included in the TAC, Camacho's claims are still barred on their face by the statute of limitations for the ADA, FHA, and the fair housing laws of the State of Hawaiʻi. And because a "claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations . . . when the running of the statute is apparent on the face of the complaint," *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010), Defendants argue that the court should dismiss Camacho's complaint as untimely.

Under the FHA, ADA, and the fair housing laws of the State of Hawaiʻi, a claim must be brought not later than "two years after the occurrence or the termination of an alleged discriminatory practice." 42 U.S.C. § 3613(a)(1)(A); Haw. Rev. Stat. § 515-9(b); *Greer v. Haw. Permanente Med. Grp., Inc.*, Civ. No. 24-00299, 2025 WL 358448, at *8-9 (D. Haw. Jan. 31, 2025) (discussing the statute of limitations for ADA claims). It remains clear from the face of the TAC that the latest occurrence of any factual allegation

underpinning a claim presented in the TAC took place in June 2020.[2] The statute of limitations therefore would have presumptively expired in June 2022 at the latest. And because this action was not filed until August 2024, the claims are untimely on their face unless the TAC provides some reason to believe that the statute of limitations should have been tolled during this period. *See, e.g.*, *Morales v. City of Los Angeles*, 214 F.3d

[2] The TAC includes two allegations of conduct by Defendants after June 2020, but neither offers a reason to conclude that any claim in the complaint accrued any later than June 2020. First, Camacho alleges that an ADA claim accrued as late as August 15, 2021, when a prospective vacation renter declined to rent with Camacho due to uncertainty over whether the AOAO Board would approve her use of a service animal. But as the court previously explained, that allegation cannot support an ADA claim, because Camacho never made a request on the prospective guest's behalf, and the denial of such a request is an "essential element" of any reasonable accommodation claim under the ADA. *See Camacho*, 2026 WL 1196577, at *5 n.2.

Second, the TAC alleges that sometime before April 7, 2022, the AOAO retaliated and discriminated against Camacho by "block[ing] [him] from the last meeting and . . . ignoring [his] request for the video/audio recording they made on Zoom despite [his] accommodation request for such recordings." Dkt. No. 125, at PageID.1499. But no account of this incident was included in the SAC. And as the court cautioned Camacho in its order permitting him to file an amended complaint, the grant of leave to amend was "not a license for him to add new legal claims or factual allegations" and could not be used "to present transactions or occurrences which have not been previously pleaded or to assert new violations beyond those already in the complaint." *Camacho*, 2026 WL 1196577, at *7. The court therefore declines to consider this newly added allegation. In any event, that claim could not have been pending before HUD or HCRC pursuant to the complaint filed in March 2021 and would not have been statutorily tolled by any pending administrative proceeding. The two-year statute of limitations therefore would have expired for that claim in April 2024, several months before this lawsuit was filed. The upshot is that this new allegation still provides no basis to render the claims in the TAC timely.

1151, 1153 (9th Cir. 2000) (explaining that a complaint may be dismissed on statute of limitations grounds if allegations do not establish a basis for tolling).

None of Camacho's claims required administrative exhaustion, which means that he could have filed this lawsuit as soon as his claims accrued. But as the court previously explained, administrative remedies are nonetheless available. And to facilitate a plaintiff's ability to pursue them, the fact that a claim has been raised in an administrative proceeding may serve to temporarily suspend, or "toll," the statute of limitations for that claim. *See Camacho*, 2026 WL 1196577, at *5. The FHA includes a provision which tolls the statute of limitations for claims while an "administrative proceeding" is pending before HUD, 42 U.S.C. § 3613(a)(1)(B), and that provision applies in situations where a complaint is dual-filed with HUD and a state civil rights agency like HCRC. *See, e.g.*, *Dickinson v. Zanesville Metro. Hous. Auth.*, 975 F. Supp. 2d 863, 876 (S.D. Ohio 2013). But a pending HUD complaint only "tolls the limitation period on a claim if the HUD complaint is based on the same discriminatory conduct as the claim." *West v. Palo Alto Hous. Corp.*, No. 17-CV-00238, 2019 WL 2549218, at *15 (N.D. Cal. June 20, 2019).

The TAC alleges that the claims underlying Counts II-IV were included in a complaint dual-filed with HCRC and HUD. Dkt. No. 125, at PageID.1503. It also specifically alleges that the complaint *did not* include those claims that "arose from the allegations in . . . Counts I or V; and not the retaliation/ harassment/ racism/

accommodation complaints on October 20, 2019 or April 7, 2022; and not the retaliation/harassment complaints [he] alleged on April 6, 2021, May 10, 2021 and May 7, 2022, which were never added to the Charge; and not the harassment complaints [he] alleged on March 29, 2023 and later on January 17, 2024, which were ignored and never reviewed." *Id.* Indeed, any complaints made by Camacho after the HCRC/HUD complaint was filed on March 18, 2021, "could not have been a subject" of his pending complaint because they occurred while the agencies' investigation was pending. *See West*, 2019 WL 2549218, at *15. Similarly, his October 20, 2019 complaints also could not have been a subject of the dual-filed charge, since the TAC alleges that HUD closed those complaints for lack of jurisdiction on October 28, 2019. Dkt. No. 125, at PageID.1481.

Accordingly, the statute of limitations tolled only for those claims included in the HCRC/HUD charge—that is, the claims included in Counts II-IV of the TAC—while the complaint was pending from March 18, 2021, until May 12, 2023. *Id.* at PageID.1498, 1502-03. Because the latest factual allegation underlying those claims occurred no later than June 3, 2020, a minimum of 288 days elapsed before the limitations period was suspended by the filing of the complaint on March 18, 2021. The limitations period began to run again on May 12, 2023, and continued to run until Camacho filed this lawsuit on August 29, 2024, a period of 475 days. Those numbers sum to 763 days, which exceeds the two-year period permitted by the statute of limitations under federal

or state law. And because the TAC alleges that Counts I and V were not successfully raised in any administrative proceeding at all, they are not subject to statutory tolling at all and therefore remain untimely on their face.[3]

Camacho offers several reasons to resist these conclusions. His overarching claim is that when he attempted to initiate a complaint with HUD in October 2019, his efforts effectively tolled the statute of limitations on all of his claims until he filed this lawsuit in August 2024. *See* Dkt. No. 128, at PageID.1794-1805. As far as his federal claims are concerned, that argument is unpersuasive. The FHA provides for tolling only during the pendency of an "administrative proceeding." 42 U.S.C. § 3613(a)(1)(B). And under the FHA, an "administrative proceeding begins when an aggrieved person files a complaint with the Secretary of the Department of Housing and Urban Development." *Smithrud v. City of St. Paul*, 746 F.3d 391, 395-96 (8th Cir. 2014) (citing 42 U.S.C. §§ 3602, 3610). If there is "no timely filed administrative complaint with HUD, there is no basis for application of the statutory tolling provision." *Fair Hous. Council of Or. v. Cross Water Dev., LLC*, No. C08-5755, 2009 WL 799685, at *2 (W.D. Wash. Mar. 24, 2009).

---

[3] Insofar as Count I includes a claim under the ADA, that claim is independently barred by the two-year statute of limitations because the ADA, "unlike the FHA," does not include a tolling provision. *See Bortnick v. Hous. Auth. of Lincoln Cnty.*, No. 25-cv-01072, 2026 WL 788908, at *2 (D. Or. Mar. 20, 2026).

Although the TAC includes many allegations about communications made by Camacho to HUD, there is only one allegation suggesting that a complaint had been successfully filed with HUD—and that is the allegation that a dual-filed complaint was submitted to HUD and HCRC in March 2021.[4] Instead, the allegations in the TAC show that despite Camacho's desire to file multiple complaints, he was unable to initiate any administrative proceeding other than the one dual-filed in March 2021. According to the TAC, Camacho attempted to file a complaint with HUD in October 2019, but was rebuffed based on HUD's apparent misapprehension that he had previously filed a

---

[4] There is a colorable argument to be made that Camacho's pre-complaint communications with HCRC "could qualify as a complaint" for purposes of the anti-discrimination laws of the state of Hawaiʻi. *Hale v. Hawaii Publ'ns, Inc.*, 468 F. Supp. 2d 1210, 1230 (D. Haw. 2006). But it is "clear that filing a complaint with a state agency . . . does *not* toll the running of the FHA statute of limitations" unless that complaint is dual-filed with HUD. *Cf. Lath v. Oak Brook Condo. Owners' Ass'n*, Civ. No. 16-cv-463, 2017 WL 3444774, at *3 (D.N.H. Aug. 8, 2017) (original emphasis). And the TAC does not allege that any of Camacho's pre-complaint communications with HCRC were dual-filed with (or otherwise simultaneously communicated to) HUD.

Camacho also raises a related argument that his pre-complaint communications with HUD should serve to toll the statute of limitations because "any written statement regardless of the name given to it" may be "accepted as a sufficient complaint . . . if it contains names, addresses, and a brief description of the discrimination." Dkt. No. 128, at PageID.1796 n.1. But the case he cites in support of this position, *Casavantes v. Cal. State Univ., Sacramento*, 732 F.3d 1441 (9th Cir. 1984), *abrogated in part by Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008), involved a Title VII employment discrimination claim, not a FHA claim. In any event, the relevant statutory tolling provision of the FHA is triggered only during the pendency of an administrative proceeding, and the TAC itself alleges that each time Camacho attempted to communicate various allegations of wrongdoing to HUD, the agency took no action or affirmatively rebuffed him. Accordingly, an "administrative proceeding" could not have begun pending as a result of any of Camacho's pre-complaint communications with HUD.

similar complaint with HCRC. Dkt. No. 125, at PageID.1481. He next attempted to "complain[] to HUD about the anti-islander rule" by raising "some questions" in November 2020, but HUD did not accept that complaint or initiate a new administrative proceeding; instead, HUD responded by informing Camacho that "in order to evaluate [his] claim . . . , they needed to discuss it with [him]" and asked him "to provide additional information by email." Dkt. No. 125, at PageID.1492. Although Camacho apparently followed up, *see id.*, the TAC does not allege that HUD ever took any further action on his inquiry. Indeed, according to the TAC, the next action taken by HUD was its November 2021 refusal to again accept a new complaint from Camacho. *Id.* at PageID.1499. Under similar circumstances, other courts have concluded that when the agency requests additional information from the complainant and then takes no further action on the complaint, the FHA's tolling provisions are not triggered. *See Guion v. Bonner Homeless Transitions Bd. of Dirs.*, No. 18-cv-00186, 2020 WL 1666765, at *7 (D. Idaho Apr. 2, 2020), *aff'd*, 2021 WL 5356528 (9th Cir. Nov. 17, 2021). The court appreciates Camacho's frustration about HUD's refusal to accept his additional complaints despite his good-faith efforts to file them, but the upshot is that nothing in the TAC supports the application of the FHA's statutory tolling provisions—except to the extent triggered by the March 2021 dual-filed complaint, as discussed above.

Camacho offers a different argument for why his state law claims should be considered timely. Claims for housing discrimination under Hawaiʻi law may be

brought in a civil action "no later than two years after the occurrence or the termination of an alleged discriminatory practice." Haw. Rev. Stat. § 515-9(b). Notwithstanding this limitation, an aggrieved person may also file a complaint with HCRC and, if HCRC issues a "notice of right to sue" on the claims before it, the aggrieved person "must . . . exercise[]" that right and file a civil action "within ninety days of receipt" of the notice. Haw. Rev. Stat. § 515-9(a)(2). It follows that a person seeking to bring a housing discrimination claim under Hawai'i law must either file suit within two years of their claim's accrual or within 90 days of receiving a right-to-sue notice from HCRC (or else must fully exhaust their administrative remedies). *See United States v. Haw. Student Suites, Inc.*, Civ. No. 19-00528, 2020 WL 4464377, at *3 (D. Haw. Mar. 20, 2020), *report and recommendation adopted as modified*, 2020 WL 1970706 (D. Haw. Apr. 24, 2020).

Camacho concedes that he did not assert any of his state law claims within two years of their accrual or within ninety days of HCRC's closure letter, but he offers several reasons why this deficiency should not bar those claims. First, he contends that the 90-day limitation applies only to actions commenced in state court, and since this action was initiated in federal court, he argues that the 90-day limit in § 368-12 does not apply. That argument is without merit. Although Camacho submits that the term "civil action" is used in the relevant portion of the Hawai'i Revised Statutes to refer to only those actions filed in the Circuit Court of the State of Hawai'i, he cites no authority in support of that interpretation, and the court is aware of none. To the contrary, this

court has consistently applied the 90-day limitation in § 368-12 to actions filed in federal court. *See, e.g.*, *Daguio v. Salvation Army, Inc.*, Civ. No. 06-00407, 2007 WL 9710580, at *2-3 (D. Haw. Nov. 8, 2007); *Patrick v. 3D Holdings, LLC*, Civ. No. 13-00638, 2014 WL 1094917, at *11 (D. Haw. Mar. 18, 2014).

Camacho offers one additional reason to conclude that the 90-day limitation does not bar his state law claims. Under both § 368-12 and § 515-9(a)(2), a complainant's right to sue "must be exercised within ninety days of receipt of the notice." But according to the TAC, Camacho never actually received that notice, and so Camacho argues that the 90-day clock could never have begun running in the first place. Dkt. No. 125, at PageID.1502-04; Dkt. No. 128, at PageID.1797 & n.2, 1798-99, 1813, 1816-18.

This argument is something of a Catch-22 for Camacho. As noted, a plaintiff seeking redress for claims brought under Haw. Rev. Stat. § 515 may either proceed through the administrative process with HCRC or may elect to file "a civil action for discriminatory practices made unlawful by this chapter no later than two years after the occurrence or the termination of an alleged discriminatory practice." Haw. Rev. Stat. § 515-9(b); *see also Shavelson v. Haw. Civil Rights Comm'n*, 740 F. App'x 532, 534 (9th Cir. 2018) (explaining that a "plaintiff may sue . . . without receiving a reasonable cause determination" from HCRC). But it follows that a plaintiff who "want[s] to file a civil action without first exhausting administrative remedies" must do so "within two years after the alleged discriminatory acts under § 515-9(b)," or else must "obtain[] a right to

sue letter from the HCRC." *Haw. Student Suites*, 2020 WL 4464377, at *3. If the plaintiff fails to meet "the two-year window following the alleged discriminatory act in which [he] could have filed a civil claim while [his] charge was pending before the HCRC," the court cannot exercise jurisdiction over the claim "[w]ithout a right to sue letter from HCRC." *Id.* It is clear from the face of the TAC that Camacho did not bring any claims within two years of the alleged discriminatory acts, so if it is true that Camacho never received a right-to-sue notice from HCRC, the court cannot exercise jurisdiction over it. *See id.*

Instead, the court elects to liberally construe the TAC to allege that Camacho eventually did receive actual or constructive notice of his right-to-sue from HCRC. According to the TAC, Camacho contacted HUD on May 6, 2024, to inquire about appealing HCRC's decision to close his complaint, suggesting that he was aware of the closure by that date. Dkt. No. 125, at PageID.1504. Assuming that Camacho was aware of his right to sue by May 6, that would still not render his claims timely, since the complaint was not filed until August 29, 2024—more than 90 days later. Construing the allegations in the TAC in the light most favorable to Camacho, his state law claims raised in Counts II-IV are barred by the statute of limitations. *See Daguio*, 2007 WL 9710580, at *2-3 (dismissing as untimely a claim brought after the 90-day period commenced by the right-to-sue notice); *Patrick*, 2014 WL 1094917, at *11 (same).

Camacho's claims are therefore untimely on their face and cannot be saved by statutory tolling. The only remaining possibility for salvaging his claims, then, is the application of equitable tolling. Equitable tolling is available where, "despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008) (cleaned up). To establish entitlement to equitable tolling, a plaintiff must therefore "demonstrate that he has been pursuing his right diligently, and that some extraordinary circumstance stood in his way." *Greer*, 2025 WL 358448, at *9 (cleaned up). And extraordinary circumstances, in turn, are circumstances that "are beyond the control of the complainant and [which] make it impossible to file a complaint within the statute of limitations." *Id.* (cleaned up). Accordingly, equitable tolling is "typically granted" when a plaintiff is unable timely file an action "as a result of external circumstances beyond their direct control," but "typically denied in cases where a litigant's own mistake clearly contributed to his predicament." *Harris v. Carter*, 515 F.3d 1051, 1055 (9th Cir. 2008).

The court assumes for the purposes of this motion that equitable tolling is available on all of the claims in the TAC. *See, e.g.*, *Garcia*, 526 F.3d at 465 & n.8 (discussing equitable tolling for FHA claims), *but see also id.* at 472 n.5 (Fisher, J., dissenting) (describing the majority opinion as containing an "implied holding that Congress intended to bar equitable tolling for *all* FHA claims"); *Greer*, 2025 WL 358448, at *9-10 (discussing equitable tolling for ADA claims); *Weaver v. A-American Storage*

*Mgmt. Co., Inc.*, Civ. No. 10-00600, 2011 WL 97651, *5-7 (discussing the applicability of equitable tolling to Haw. Rev. Stat. § 368-12). Because the FHA contains its own statute of limitations, federal equitable tolling principles apply, *see Sunset Drive Corp. v. City of Redlands*, No. CV 02-9109, 2008 WL 11423918, at *6 n.4 (C.D. Cal. Dec. 2, 2008), whereas claims brought under the state's housing discrimination laws and the ADA are subject to Hawai‘i equitable tolling principles, *see Greer*, 2025 WL 358448, at *9. But since "Hawai‘i has adopted federal equitable tolling principles," the analysis is essentially the same. *Id.* (collecting cases).

Camacho argues that his "numerous communications to HCRC, HUD and the Ombudsman as well as [his] appeals and amendments constitute reasonable diligence, and [the agencies'] failure to mail [his] Notices of Dismissal or respond to [his] emails knowing I never received the closure letters constitute extraordinary circumstances to uphold equitable tolling." Dkt. No. 128, at PageID.1818. The court has no reason to doubt the sincerity of Camacho's belief that he acted with reasonable diligence and was hamstrung by extraordinary circumstances. But the legal test for equitable tolling is "a very high bar, and is reserved for rare cases." *Spriestersbach v. Hawaii*, 622 F. Supp. 3d 948, 957 (D. Haw. 2022) (quoting *Yow Ming Yeh v. Martel*, 751 F.3d 1075, 1077 (9th Cir. 2014)). The TAC does not establish that that bar has been cleared here. Nothing in the TAC suggests that Camacho faced any "impediment caused by extraordinary circumstances" that causally "prevented [his] timely filing" of a lawsuit. *Smith v. Davis*,

953 F.3d 582, 595 (9th Cir. 2020). And although it is clear from the TAC that Camacho was in near-constant contact with HCRC and HUD at certain points during the period between the accrual of his claims and the initiation of this lawsuit, the TAC does not establish—as it must in order to justify equitable tolling—that he was reasonably diligent "in all time periods—before, during, and after the existence of an extraordinary circumstance." *Id.*

The court first turns to the question of whether the TAC reveals any extraordinary circumstance that stood in Camacho's way and prevented him from timely filing this action. Camacho argues that it does: he alleges in the TAC that he never received a right-to-sue letter and therefore lacked "the vital information [he] needed in order to know that [his] administrative complaints were closed," which "obstructed [his] ability to file a lawsuit" and thereby constituted an extraordinary circumstance. Dkt. No. 128, at PageID.1816.

As an initial matter, it is difficult to understand how Camacho's non-receipt of the closure letter could constitute an extraordinary circumstance beyond his control which prevented him from timely filing. *See Smith*, 953 F.3d at 595. As noted, none of the claims in the TAC required Camacho to exhaust administrative remedies as a prerequisite to filing, so he could have asserted those claims in a lawsuit at any time. In other words, although Camacho may have wished to receive a right-to-sue letter before filing a lawsuit of his own—a reasonable desire, given that the notice might have

facilitated or streamlined the prosecution of his claims—that cannot be considered an extraordinary circumstance that prevented his timely filing, since at all times he possessed the ability to file a lawsuit asserting the same claims regardless of the status of his administrative complaint. In a similar vein, nothing in the TAC or Camacho's briefing indicates what "vital information" was contained within the right-to-sue notice, or why that information was necessary before Camacho could file a suit on his own. As Defendants point out, there is no dispute that Camacho "knew that his claims existed, knew that HCRC was investigating them, and knew that the administrative process did not eliminate his obligation to protect his judicial remedies." Dkt. No. 129, at PageID.1835. While the court can understand Camacho's frustration at not receiving a right-to-sue notice that might have proven helpful, it cannot conclude that Camacho's non-receipt of the notice constituted an extraordinary circumstance beyond his control that prevented timely filing. *Cf. Warren v. Uribe*, No. CIV S-10-2120, 2011 WL 3875869, at *3 n.5 (E.D. Cal. Sept. 1, 2011) (explaining that the "decision to wait to file" while "seeking additional evidence was, unfortunately, a poor tactical decision, rather than the sort of external circumstance" that would justify equitable tolling); *Lopez v. Legrand*, No. 11-cv-00181, 2012 WL 1017780, at *4 (D. Nev. Mar. 26, 2012) (noting that a litigant's "misguided belief" that he "should wait and do more to perfect his filing . . . does not provide a basis for equitable tolling").

Camacho argues, however, that a "reasonable person" should be permitted to "give HCRC an opportunity to resolve a discrimination complaint before filing a lawsuit" and should be "entitled to rely on HCRC's presumption of regularity that it would follow regulatory procedures . . . before considering case closure." Dkt. No. 128, PageID.1808. That argument is not without some appeal. But even if it were sufficient to render the non-receipt an extraordinary circumstance, the TAC would still not contain sufficient factual matter to establish that Camacho acted with reasonable diligence to justify the application of equitable tolling.

"For a litigant to demonstrate he has been pursuing his rights diligently, he must show that he has been reasonably diligent . . . not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal court." *Perez v. Reubart*, 150 F.4th 1164, 1178 (9th Cir. 2025) (cleaned up). Assuming that Camacho's uncertainty about the status of his complaint could constitute an extraordinary circumstance, he would still need to show reasonable diligence in pursuing his rights *after* he realized that his complaint had been closed. The TAC makes clear that Camacho had actual knowledge that his case was closed by "the Spring of 2024," when HCRC informed him of the same. Dkt. No. 125, at PageID.1504. And as noted, he must have been aware of the closure by May 6, 2024, because he contacted HUD on that date in an effort to appeal the HCRC closure decision (and was rebuffed by HUD the following day). *Id.* Camacho therefore should

have known that his claims, which were well over two years old by that point, were potentially untimely—or at a minimum, were actively within the 90-day right-to-sue period triggered by the closure of his administrative complaint—and should have promptly filed a lawsuit to protect his rights.

Instead, Camacho waited nearly four months to do so. That is insufficient to demonstrate the diligence necessary to establish entitlement to equitable tolling. Courts have refused to apply equitable tolling even in analogous cases where a plaintiff filed suit with even greater alacrity. For example, the plaintiff in *Irwin v. Department of Veterans Affairs* did not initially receive a right-to-sue notice informing him of the need to file suit within 30 days, but learned of the notice several weeks later and then filed a lawsuit within 30 days of his receiving actual knowledge. The Supreme Court nonetheless declined to grant equitable tolling, describing the plaintiff's conduct as "a garden variety claim of excusable neglect." 498 U.S. 89, 96 (1990). The same reasoning is applicable to Camacho's conduct here. *See also, e.g.*, *Scholar v. Pac. Bell*, 963 F.2d 264, 267-68 (9th Cir. 1992) (declining to grant equitable tolling to a plaintiff who did not personally receive notice of a right-to-sue letter until several weeks after its delivery and who filed only three days late); *Ching v. Chugach Mgmt. Servs., Inc.*, Civ. No. 13-00023, 2014 WL 282225, at *6 (D. Haw. Jan. 27, 2014) (concluding that plaintiff's "failure to get his mail even though he was told about the notice does not provide the circumstances making tolling of the limitation period appropriate"). And although

Camacho attempts to explain his delay in filing after he was told that his complaint was closed by offering his erroneous belief that he "still had all the time remaining on the [statute of limitations] to file, which was two years," Dkt. No. 128, at PageID.1814, his "miscalculation of a deadline cannot produce an extraordinary circumstance" or otherwise justify equitable tolling. *Perez*, 150 F.4th at 1173.

There is similarly no basis for the court to conclude that equitable tolling might apply to the claims that were not presented in the dual-filed March 2021 complaint. The TAC makes clear that Camacho was aware that, despite his best efforts, those claims were not being evaluated through an administrative process. He therefore either knew or should have known that the statute of limitations was not being tolled by any administrative review. It is a plaintiff's "own responsibility to exercise due diligence in preserving his legal rights and to bring suit in a timely manner," *McRee v. Goldman*, No. 11-CV-00991, 2012 WL 929825, at *7 (N.D. Cal. Mar. 19, 2012) (cleaned up), and a person of reasonable diligence (as reasonableness is understood within the caselaw) would have done so here. The court therefore cannot say that Camacho was reasonably diligent in waiting over four years to assert the claims that were not raised in his administrative complaint.

**B. Further Leave to Amend is Not Warranted**

Generally, when the court dismisses a complaint drafted by a pro se plaintiff, leave to amend is granted. *See, e.g.*, *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

But leave to amend may be denied, even to a pro se plaintiff, where further amendment would unduly prejudice the opposing party, cause undue delay, or be futile. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). And the court's "discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

In this case, Camacho has already thrice amended his complaint, including once in response to the court's grant of judgment on the pleadings for Defendants and pursuant to detailed instructions from the court about what an amended complaint would need to allege in order to avoid dismissal. And despite the "highly detailed pleading" filed pursuant to the court's grant of leave to amend, the TAC still does not include facts which, even when construed in the light most favorable to Camacho, could establish the timeliness of his claims. *See Ilaw v. United States*, No. 11-cv-5000, 2012 WL 629244, at *3 (N.D. Cal. Feb. 27, 2012). The court therefore finds that further amendment would be futile and dismisses the TAC with prejudice and without leave to amend. *Accord, e.g.*, *Ryan v. Ass'n of Apt. Owners of Waikiki Landmark*, Civ. No. 21-00438, 2024 WL 6990722, at *8 (D. Haw. Nov. 21, 2024) (concluding that leave to amend would be futile given that plaintiff had "already amended his complaint" and still did not "sufficiently allege facts about the AOAO's actions or 'reasonable diligence' on his part to pursue his

claims”); *Reyna v. PNC Bank, N.A.*, Civ. No. 19-00248, 2020 WL 2309248, at *9 (D. Haw. May 8, 2020).

## CONCLUSION

For the foregoing reasons, Defendants’ motion to dismiss the Third Amended Complaint is GRANTED. The Third Amended Complaint is DISMISSED with prejudice and without leave to amend. The Clerk of Court is ordered to close this case and enter Judgment for Defendants.

IT IS SO ORDERED.

DATED: September 15, 2026, at Honolulu, Hawai‘i.

/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge